## UNITED STATES DISTRICT COURT
## FOR DISTRICT OF KANSAS

| | |
|---|---|
| **CBW BANK,** a Kansas State Chartered Bank**,**<br><br>**Plaintiff,**<br><br>v.<br><br>The **FEDERAL DEPOSIT INSURANCE CORPORATION**; **JENNIFER WHANG**, in her official capacity as an ALJ of OFIA; and **C. SCOTT MARAVILLA**, in his official capacity as an ALJ of OFIA,<br><br>**Defendants.** | Case No. 24-cv-2535-DDC-BGS |

## PLAINTIFF'S COMBINED REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION AND RESPONSE IN OPPOSITION TO FDIC'S MOTION TO DISMISS

## I.    INTRODUCTION

CBW is a small, minority-owned bank, singled out by the FDIC for arbitrary treatment and an outsized penalty amount, that simply seeks a constitutionally compliant adjudication.  It is entitled to a jury in an Article III court under the Seventh Amendment because the FDIC's claims are punitive and legal in nature.  The FDIC, however, intends to plow forward in unconstitutional agency proceedings, opposing even a brief pause to allow this Court to consider the Bank's constitutional claims.  Because the FDIC refuses to stay the administrative proceedings, CBW requests a ruling on its motion **as soon as possible.**

The FDIC's response only confirms that a preliminary injunction should issue here.  The FDIC effectively concedes that its claims against CBW are legal claims that require a jury under the Seventh Amendment, since it seeks significant punitive, civil monetary penalties (CMPs).  Instead, it leans wholly into the very limited "public rights exception" to the Seventh Amendment, which the Supreme Court emphasized this past term should not be further expanded.  But the FDIC does not carry its heavy burden.  The relevant statutes expressly recognize that AML obligations protect private and public interests and contain common law soil, using negligence terms of art, which takes the FDIC's claims outside the scope of the exception.

The other three injunction factors also favor CBW.  The FDIC has no response to the fact that CBW's Seventh Amendment claim involves both structural constitutional and individual rights components and falls within the category of cases where irreparable harm arises from constitutional violations.  The FDIC is also incorrect that post-adjudication review is adequate to prevent irreparable injury where, as here, a prevailing party might never be able to remedy the violation.  It also entirely fails to address CBW's reputational and economic harms.  Finally, there is no public interest in enforcing banking laws through an unconstitutional adjudication.

Nor is Section 1818(i) an impediment to the injunction issuing. The plain language does not preclude review of CBW's structural constitutional claim and, moreover, serious constitutional concerns would arise if this Court were to interpret the provision to preclude review here. Under the FDIC's view of Section 1818(i), if the Bank were successful in the administrative proceeding, it would never have a forum in which it could bring its Seventh Amendment claims.

As for the ALJ removal protection claim, which the FDIC also moves to dismiss, CBW has sufficiently stated a claim for relief under Supreme Court precedent.

This Court should grant the preliminary injunction motion and deny the motion to dismiss.

**II.     ARGUMENT**

**A. Section 1818(i) does not bar this Court from adjudicating CBW's structural constitutional claims.**

The FDIC moves to dismiss CBW's claims, arguing that, even if CBW is correct that the Seventh Amendment forbids the FDIC from adjudicating its claims in-house, there is nothing any court can do to prevent the unconstitutional, wasteful, and injury-causing proceeding. As previewed in CBW's preliminary injunction motion, this claim is meritless. Dkt. 2 at 14-15.

Under Article III, the judicial power "extend[s] to all Cases, in Law and Equity, arising under th[e] Constitution [and] the Laws of the United States." *See* U.S. Const. art. III §§ 1, 2. Similarly, under 28 U.S.C. § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution[.]" Where Congress intends to strip federal courts of jurisdiction to consider collateral, structural constitutional claims that arise from administrative proceedings, it does so expressly (as it is required to do).

Section 1818(i) does not expressly strip these types of claims. To the contrary, Section 1818 does the following: Subsection (h) authorizes court of appeals review of final Board orders on application of an aggrieved party. Section 1818(i)(1) vests a district court with "jurisdiction

2

and power to order and require compliance" when the Board seeks enforcement of any effective and outstanding notice or order. However, Section 1818(i)(1) then further provides that "except as otherwise provided in this section . . . no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section, or to review, modify, suspend, terminate, or set aside any such notice or order." Section 1818(i) therefore establishes the circumstances in which a court has jurisdiction to permit or preclude enforcement of a notice or order and directs that a court may only review and issue relief pertaining to "any notice or order" as permitted under Section 1818(h).

Here, CBW seeks review of the proceeding itself, which suffers from Constitutional defects that cannot be remedied by the review Section 1818(h) offers. And if Congress intended through Section 1818(i) to preclude review of all claims arising under 28 U.S.C. § 1331, it would have used broader and more explicit phrasing than it did here. *See Burgess v. FDIC*, 639 F. Supp. 3d 732, 742-46 (N.D. Tex. 2022). Congress did not, for example, strip courts of jurisdiction "to affect by injunction or otherwise ***any proceeding*** under this section" or state that it stripped jurisdiction for all claims brought under Section 1331—including the structural constitutional claims here— as it knows how to do. *Cf. Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 10 (2000) (finding review of constitutional claims precluded where statute provided: "[n]o action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter."). Instead, Congress used the more specific, and limited, "notice or order" language. Nor did Congress set forth the jurisdiction-stripping provision in a separate subpart. Rather, it included it as a clause in the provision providing for enforcement in the courts of notices and orders, emphasizing it should be interpreted as pertaining to the specific "notice or order" context.

3

The requirement that Congress speak clearly when depriving courts of jurisdiction to consider constitutional claims is all the more important where, as here, a party can be deprived from *ever* having its constitutional claim heard.  Here, a petition for review can only be filed in the event CBW loses.  And this is too late because the Seventh Amendment is centered on the role of the jury "as a fact-finding body."  *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935).  There can be no appeal if CBW prevails or the FDIC dismisses the charges on review after the ALJ hearing—even though a constitutional violation occurred.  *See* 12 U.S.C. § 1818(h)(2) (review only permitted where the party seeks that the "order of the agency be modified, terminated, or set aside").[1]  CBW has a right to have a jury and not an ALJ sit as factfinder regardless of outcome, so an unremediable constitutional violation will occur if there is no way to obtain pre-adjudication review of a Seventh Amendment claim.[2]  Given that the FDIC's construction of 1818(i) would, in certain circumstances, unconstitutionally deny CBW any forum to address its Seventh Amendment claim, and because the statute can be fairly read to permit judicial review here, the canon of constitutional avoidance requires this Court adopt CBW's interpretation.  *See Johnson v. Robison*, 415 U.S. 361, 366-74 (1974).[3]

---

[1] Compounding the issue, ALJ Whang does not seem to believe she is empowered to consider the constitutional issue pre-hearing.  *See Order No. 4: Denying Motion to Stay* (attached as **Ex. A**) ("[CBW] professes that its instant federal district court action is necessary because it lacks 'other adequate means to attain the desired relief,' this is not correct: like all subjects of FDIC enforcement actions, [CBW] may raise any challenges to the proceeding, including structural constitutional challenges, ***by appealing to the appropriate appellate court once a final order is issued by the agency***.") (footnotes omitted) (emphasis added).

[2] This issue of lack of federal forum equally applies to CBW's ALJ removal protection claims.  *See Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 191 (2023) (observing structural injury "is impossible to remedy once the proceeding is over, which is when appellate review kicks in").

[3] Should this Court agree with the FDIC's interpretation, then Section 1818(i) would be unconstitutional because it would in some instances entirely deprive the federal courts of review of a claim arising under the constitution, rendering the Seventh Amendment violation irremediable.  In the event this Court determines that Section 1818(i) precludes review here, CBW preserves a challenge to Section 1818(i)'s constitutionality.  *See Webster v. Doe*, 486 U.S. 592, 603 (1988).

For that reason, FDIC's argument that Congress did not need to expressly preclude review of structural constitutional claims falls flat. Dkt. 12 at 9-10.[4]  The FDIC argues that the higher standard required by *Webster v. Doe*, 486 U.S. 592, 603 (1988), only applies if there is a complete denial of review. Dkt. 12 at 10 n.4.  But that is the situation here: CBW can only raise its claim ***after*** its rights have been violated and ***only if*** it does not prevail on the merits.  To the extent Congress desired to deny CBW a forum for the claims, it would have had to do so clearly.  It did not, and therefore this Court has a duty to exercise jurisdiction to address CBW's structural claims.

The FDIC nevertheless relies on *Board of Governors v. MCorp Fin., Inc.*, 502 U.S. 32 (1991), to argue that Section 1818(i) is dispositive in depriving district courts of jurisdiction to enjoin agency proceedings, even where the claims involve structural constitutional challenges. Dkt. 12 at 7.  But the FDIC reads *MCorp* far too broadly.  *MCorp*'s discussion of the preclusive effect of Section 1818(i) arose from a question of whether a federal court could review and enjoin an agency proceeding allegedly based on a regulation promulgated in excess of the agency's statutory authority.  In context, *MCorp*'s statement that "[Section 1818(i)] provides . . . clear and convincing evidence that Congress intended to deny the District Court jurisdiction to review and enjoin the Board's ongoing administrative proceedings," *id.* at 44, was about Section 1818(i)'s preclusive effect for reviewing the merits of a statutory dispute prior to a final decision in a lawful

---

[4] The cases the FDIC cites (Dkt. 12 at 8 n.1, 10), like *Bank of Louisiana v. FDIC*, 919 F.3d 916 (5th Cir. 2019), did not involve Seventh Amendment issues.  *Bank of Louisiana* also did not find that Section 1818(i) explicitly withdrew jurisdiction over the claims and instead only determined under the *Thunder Basin* factors that jurisdiction over the claims asserted there had been implicitly withdrawn.  *Id.* at 924 n.10.  In contrast, the FDIC fails to make any argument here that *Thunder Basin* precludes jurisdiction over the Seventh Amendment and ALJ removal claims.  *Office of Thrift Supervision v. Paul*, 985 F. Supp. 1465, 1468 (S.D. Fla. 1997), involved an untimely appointments clause challenge that was not raised during the administrative proceeding or through an appeal of the adverse order.  Instead, the party first raised it as a defense when the FDIC sought Section 1818(i) enforcement, and the court determined Section 1818(i) did not permit consideration of the claim in a federal court enforcement proceeding.

adjudication. *MCorp* concluded that if the party there was in fact found liable under an unlawful regulation, post-hearing review would occur before injury from the liability finding. *See id.* at 43-44. In contrast, CBW will suffer a constitutional injury regardless of the merits outcome of the adjudication, and the FDIC's interpretation of Section 1818(i) could leave the Bank without a forum to remedy that violation. At bottom, *MCorp*'s observation that Section 1818(i) is "plain" and "preclusive" does not address the scope of that preclusion and should not be overread as a broad statement on Section 1818(i)'s preclusive effect on an issue not before the Court.[5]

For similar reasons, *Henry v. OTS*, 43 F.3d 507, 512-13 (10th Cir. 1994), does not control. *Henry* held that the use of term "orders" in Section 1818(i) encompassed all orders, including "consent orders," and not just final agency orders. But the plaintiff in *Henry* challenged the validity of the underlying consent order, not the constitutionality of the agency process leading to the order. And the issue in *Henry* was whether the scope of 1818(i) applied to that challenge. CBW's claims, on the other hand, are not about enjoining any orders (final or otherwise) and are instead about the structural constitutional defects in the adjudication itself.

Nor is the reasoning of *Ponte v. FDIC*, 673 F. Supp. 3d 145, 150 (D.R.I. 2023) (*Ponte I*), persuasive or logical. The *Ponte* court reasoned that adjudicating "Ponte's [institution-affiliated party] status would surely 'affect' the enforcement proceedings because he would argue that this Court's ruling, if favorable to him, would necessitate dismissal of the Notice of Charges and [s]uch an adjudication would contravene § 1818(i)(1)." *Id.* But the argument at issue in *Ponte I* related

---

[5] To the extent cases contain broad interpretations of Section 1818(i) where the Seventh Amendment issue was not presented, it is well established that questions that "merely lurk in the record" but are not presented for review do not constitute precedents. *United Food & Commercial Workers Union, Local 1564*, 207 F.3d 1193, 1199 (10th Cir. 2000). Thus, broad pronouncements divorced from considering the scope of preclusion when the Seventh Amendment is involved are not dispositive and should not even put a thumb on the scale.

to the merits of the FDIC's claims, not the constitutionality of the agency proceeding. While, in a subsequent case, Ponte raised a Seventh Amendment challenge, the court rejected that argument without meaningful analysis and in reliance on its prior (inapplicable) decision in *Ponte I*. *See Ponte v. FDIC*, 2023 WL 6441976, at *2 (D.R.I. Oct. 3, 2023) (*Ponte II*); *see also Ponte v. FDIC*, 2024 WL 4730602, at *3-4 (D.D.C. Oct. 11, 2024) (rejecting Ponte's post-*Jarkesy* Seventh Amendment claim on collateral estoppel grounds). Whatever value the courts' rejections of Ponte's second and third bites have, their outcomes cannot be squared with the presumption that Congress must speak expressly when it intends to preclude jurisdiction of constitutional claims.[6]

FDIC also overreads the discussion of Section 1818(i) in Justice Gorsuch's *Axon* concurrence. Dkt. 12 at 9. In *Axon*, Justice Gorsuch was more broadly critiquing the *Thunder Basin* jurisdictional analysis, whereby only limited collateral claims can be considered prior to final agency action, and used Section 1818(i) as an example where Congress spoke clearly about its intent. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 208 (2023) (Gorsuch, J., concurring). But that says nothing about the scope of the preclusion Congress intended in Section 1818(i), only that Congress spoke clearly about the matters on which it spoke.[7]

In short, FDIC is asking this Court to read a statute such that it would require CBW to suffer constitutional harm in order to vindicate a constitutional right, assuming it is ever able to do

---

[6] The FDIC also argues that "[i]f the administrative case is enjoined, there is no statutory grant authorizing the FDIC to refile the notice in federal district court." Dkt. 12 at 8. But, to the extent relevant, this goes to the merits of CBW's constitutional claim, not the scope of 1818(i). Indeed, the same would hold true if, on a post-adjudication petition for review, the federal appellate court ruled in CBW's favor.

[7] Notably, the FDIC does not respond to, much less disagree with, CBW's assertion that the *Thunder Basin* factors favor review here. Dkt. 2 at 13-14; Dkt. 12 at 9.

so.  Section 1818(i) does not require that result, and this Court should not stretch the bounds of the statute to do so.[8]  FDIC's motion to dismiss should therefore be denied.[9]

### B.  CBW is entitled to a preliminary injunction on its Seventh Amendment claim.

As CBW set forth in its preliminary injunction motion, "[t]he Seventh Amendment extends to a particular statutory claim if the claim is 'legal in nature.'"  *SEC v. Jarkesy*, 603 U.S. 109, 122 (2024).  FDIC's claims are legal in nature, because they seek punitive monetary penalties.  Dkt. 2 at 5-7.  Indeed, the FDIC does not even contest that under *Jarkesy* and *Tull v. United States*, 481

---

[8] On the FDIC's view, even where it is clear that a party has a Seventh Amendment right to a jury in an Article III court, there is nothing that can be done to stop the unconstitutional juryless administrative proceeding until after the government (i.e., the taxpayer) and private party spend the time, money, and resources (and suffer reputational injury) undergoing an adjudication everyone knows is unconstitutional until a final appealable order issues.  This makes no sense.  Yet this is not only the FDIC's legal position, it is what they are doing in practice.  The FDIC has opposed—and ALJ Whang has denied—a brief stay in the agency proceeding to allow this court to adjudicate this constitutional claim.

[9] To the extent the Court agrees with the FDIC's construction of Section 1818(i)—which it should not—that should, at most, result in the denial of CBW's motion for a preliminary injunction, not a dismissal of CBW's complaint.  While, for the reasons stated, an injunction here does not "affect . . . the issuance or enforcement of any notice or order," 12 U.S.C. § 1818(i), a declaratory judgment most certainly does not.  Accordingly, if the Court denies CBW's motion on this ground, CBW requests to move immediately to summary judgment briefing.  In that regard, *Groos Nat. Bank v. Comptroller of Currency*, 573 F.2d 889, 895 (5th Cir. 1978), which held without textual analysis that an "action for declaratory judgment" falls within the "or otherwise" language of Section 1818(i), is neither controlling nor persuasive.  The term "otherwise" should not be read to include declaratory relief because it is not similar in kind to injunctive relief.  *See, e.g.*, *Olagues v. Russoniello*, 770 F.2d 791, 803 (9th Cir. 1985) (recognizing the "considerable difference between ordering a government official to conduct his activities in a certain manner, and simply pronouncing that his conduct is unlawful and should be corrected").  Thus, "or otherwise" is best interpreted to capture forms of relief like writs of mandamus or prohibition, cease and desist orders, or temporary restraining orders that order the FDIC to do or not do something and thereby "affect" the notice or order.  *See M. S. v. Premera Blue Cross*, 118 F.4th 1248, 1270 (10th Cir. 2024) (applying the *ejusdem generis* and *noscitur a sociis* interpretative canons—which instruct that a word is known by the company it keeps and that when a general phrase follows a list of specific items, then the general phrase is read to include only items similar in kind or class as the specifically listed terms—to conclude that the phrase "other instruments" "means legal documents of the type recited in the preceding list").

U.S. 412, 422 (1987), its claims are legal in nature.  Instead, the FDIC relies solely on the public rights exception and argues for this reason that a jury trial is not required.  The FDIC is wrong.

The FDIC has not carried its burden to show the public rights exception applies.  *Jarkesy* instructs that "[e]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts."  603 U.S. at 132.  Thus, under *Jarkesy*, unless it is not arguable that a matter falls within the scope of the public rights doctrine, this Court must err in favor of not applying the public rights exception.  Here, these claims have no historic pedigree of being adjudicated by the executive and legislative branches, the authorizing statute explicitly states that it concerns both public and private rights, *see* 31 U.S.C. § 5318(h)(2)(B)(i), and the claims carry common law soil, deriving standards from traditional tort claims.  The FDIC cannot show that the public rights exception clearly applies here and therefore the Supreme Court precludes this Court from expanding the public rights exception to cover this new scenario.  CBW has therefore shown a likelihood of success.

### a. However the FDIC characterizes its role here, the public rights exception does not apply.

The FDIC incorrectly argues that the public rights exception applies because its claims against CBW belong to the sovereign.  Dkt. 12 at 11-14.  The FDIC claims that, unlike in *Jarkesy*, the claims here implicate government prerogatives that can be tried without a jury, because bank failures can draw down the Federal Deposit Insurance Fund ("DIF").  Dkt. 12 at 11.  This is a distortion of both *Jarkesy*'s holding and the nature of the FDIC's claims against CBW.

First, *Jarkesy* rejects the assertion that public rights are implicated whenever the government asserts a claim that belongs to it in its sovereign capacity.  *See Jarkesy*, 603 U.S. at 168 (Sotomayor, J., dissenting) (observing that, before *Jarkesy*, "[t]his Court's longstanding precedent and established government practice uniformly support[ed] the constitutionality of . . .

9

agency adjudications of statutory claims for civil penalties brought by the Government in its sovereign capacity"). Instead, for the exception to apply, it must fall within one of the "distinctive areas involving governmental prerogatives" that the Supreme Court has already held can be removed from an Article III court. *See Jarkesy*, 603 U.S. at 120. The FDIC's claims do not.

The relevant inquiry is whether these claims "historically could have been determined exclusively by the executive and legislative branches." 603 U.S. at 128. The closest the FDIC comes to addressing the actual test is an attempt to fit its AML compliance claims against CBW in the "vested right" immigration / tariff line of cases, which allowed Congress to impose monetary penalties—without a jury trial—on parties obligated to assist the United States in excluding certain classes of immigrants or goods from entry to the country. *See Jarkesy*, 603 U.S. at 129-30 (citing *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320 (1909); *Ex parte Bakelite Corp.*, 279 U.S. 438, 446 (1929)). The government, however, has broad "inherent power" over "immigration and the status of aliens," that it possesses "as sovereign to control and conduct relations with foreign nation." *Arizona v. United States*, 567 U.S. 387, 395 (2012); *Jarkesy*, 603 U.S. at 129-30 (noting the same for cross-border commerce). The BSA, by contrast, regulates financial markets and banking practices that pre-date its enactment in 1970, imposing common-law-based duties to, among other things, monitor for and report suspicious transactions, whether they be domestic or foreign. In that sense, the FDIC through the BSA operates no differently than the SEC, which *Jarkesy* recognized acts "to regulate transactions between private individuals interacting in a pre-existing market." 603 U.S. at 135. And here CBW and other regulated banks spend private monies to comply with these negligence-based regulations "for a public and private benefit." 31 U.S.C. § 5318(h)(2)(B)(i).

FDIC's efforts to recharacterize its claims as insurance-based, rather than regulator-based, fare no better. Disputes between insurers and insureds about policy terms or the reasonableness of a party's conduct are classic common law claims. *See, e.g.*, *Steil v. Humana Kansas City, Inc.*, 124 F. Supp. 2d 660, 662 (D. Kan. 2000) ("[T]he Court notes the general principles of insurance policy interpretation under federal common law. The interpretation of an insurance policy, like other contracts, is a question of law."); *Ayala v. State Farm Mut. Auto. Ins. Co.*, 628 F. Supp. 3d 1075, 1081 (D. Colo. 2022) (recognizing common law bad faith claim based on "[t]he reasonableness of the insurer's conduct is determined objectively and . . . proof of industry standards"). Nor does it matter that the FDIC claims that its activities "implicate public funds." Dkt. 12 at 13.[10] What matters is the nature of its claim, not the source of its funding.[11] Indeed, the BSA, which the FDIC is enforcing, applies not just to banks, but to any number of "financial institutions" (including travel agencies, pawnbrokers and casinos), *see* 31 U.S.C. § 5312(a)(2), that do not have even the tenuous connection to the "public funds" that the FDIC purports to identify.

The Ninth Circuit's 30-year-old decision in *Simpson v. OTS*, 29 F.3d 1418 (9th Cir. 1994), which concluded the public rights exception applied to a Section 1818 case, does not compel a different conclusion. *See* Dkt. 12 at 11. *Simpson* is inapplicable for at least two reasons. First, it pre-dated *Jarkesy* and applied a multi-factor "public rights" test that has since been abandoned. *Compare id.* at 1422-23 (describing and applying the multi-factor test described in *CFTC v. Schor*,

---

[10] Notably absent from the FDIC's efforts to describe the DIF as "public funds" is any mention that the DIF "has two sources of funds: assessments (insurance premiums) on FDIC-insured institutions and interest earned on funds invested in U.S. government obligations." https://www.fdic.gov/resources/deposit-insurance/deposit-insurance-fund. These are private funds.

[11] Otherwise, the fraud claims at issue in *Jarkesy* also would have implicated public funds to the extent that the SEC's congressionally appropriated money was used to fund investigative and enforcement proceedings.

478 U.S. 833 (1986)) *with Jarkesy*, 603 U.S. at 158-59 (Gorsuch, J., concurring) (observing that the Supreme Court in *Jarkesy* "does much to return us to a more traditional understanding of public rights" from the "muddled" public rights jurisprudence of *Schor* and others).[12]  Thus, while it may be true that, as the *Simpson* court opined, "[t]he purpose of enforcement of the thrift regulation laws is to safeguard the thrift industry, the depositors, and the federal insurance fund," 29 F.3d at 1423, under *Jarkesy* this is not a permissible basis for applying the public rights exception. Second, *Simpson* involved only equitable relief and not civil penalties, making the decision entirely unrelated to the question before this Court.  Under the *Jarkesy* two-step inquiry, *Simpson* should have stopped after concluding that the claim was purely equitable in nature, and not reached the public rights inquiry.  *See Jarkesy*, 603 U.S. at 123.

Nor does the FDIC's suggestion that CBW waived its right to a jury trial by accepting FDIC insurance, Dkt. 12 at 13, provide any basis to conclude the public rights exception applies.  As a general matter, a party must waive a right to jury trial by contract and do so knowingly and voluntarily.  *See Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835, 837 (10th Cir. 1988).  The FDIC cites no case law, statute, legislative history, or contract that supports its assertion that, simply by accepting FDIC insurance, CBW somehow agreed to waive its Seventh Amendment jury rights on any claim the FDIC might bring against it.[13]

---

[12] Similarly, *Cavallari v. OCC*, 57 F.3d 137 (2d Cir. 1995), pre-dates *Jarkesy*'s clarification of the public rights exception that explained the limited scope of *Atlas Roofing*.  *Cavallari*'s reasoning that, because the OCC was suing under federal banking laws, it was automatically suing as a sovereign to enforce public rights was rejected by *Jarkesy*; nor did it consider whether the banking laws the OCC sought to enforce carried common law soil.  *See id.* at 145.  And *Akin v. OTS*, 950 F.2d 1180, 1181 (5th Cir. 1992), also pre-dates *Jarkesy* and involved a claim for restitution, not CMPs.

[13] Tellingly, there is no discussion in *Jarkesy* about whether the Seventh Amendment claim turned in any way on a party's SEC registration status.

It is also not enough to point to Congress's creation of a regulatory scheme and assignment of the claims to administrative tribunals.  Congress cannot "conjure away the Seventh Amendment by mandating that traditional legal claims be . . . taken to an administrative tribunal." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 52 (1989).  The FDIC nevertheless takes *Granfinanciera* and *Atlas Roofing Co. v. OSHA*, 430 U.S. 442 (1977), out of context and speculates that Congress must have concluded a jury trial would be incompatible with the statutory scheme. Dkt. 12 at 13-14 (citing *Granfinanciera*, 492 U.S. at 61; *Atlas Roofing*, 430 U.S. at 454).  But, as *Jarkesy* notes, to the extent *Atlas Roofing* remains good law (and that is questionable), the "public rights exception as construed in *Atlas Roofing* does not extend to these civil penalty suits" and its holdings "do[] not control."  *Jarkesy*, 603 U.S. at 136.  Further, holding that the Seventh Amendment requires a jury for the claims against CBW would not necessarily dismantle the statutory scheme.  The FDIC could instead pursue equitable remedies under Section 1818 through the agency process, to the extent it were otherwise permissible for it do to so.  *See Ponte v. FDIC*, No. 24-cv-2379, Dkt. 1 at 9 & n.3 (D.D.C.) (noting that, on July 24, 2024, approximately one month after *Jarkesy* was decided, the FDIC withdrew claims for CMPs, instead pursuing only equitable relief).  Moreover, the FDIC's argument that the lack of a jury right in the statute automatically means the statutory scheme implicates public rights would result in a tautology: all Congress needs to do deprive Seventh Amendment rights would be to create a statutory scheme that deprives Seventh Amendment rights.  That is (1) illogical and (2) cannot be squared with *Jarkesy*'s discussion of the limited nature of the public rights exception and both *Jarkesy*'s and *Granfinanciera*'s holding that "[e]ven when an action 'originates in a newly fashioned regulatory scheme,' what matters is the substance of the action, not where Congress has assigned it."  603 U.S. at 134 (quoting *Granfinanciera*, 492 U.S. at 52).

**b. The FDIC must show that its claims carry no "common law soil," not simply that its claims did not exist at common law at the founding.**

The FDIC's failure to show that its claim fell within one of the historic categories of claims permitted to be assigned to the legislature or executive should end the public rights inquiry, but FDIC fares no better in trying escape the common law nature of its claims. FDIC fundamentally misunderstands the Supreme Court's holding regarding common law soil. In explaining why *Atlas Roofing* was not relevant to the *Jarkesy* public rights analysis, the Supreme Court explained that the OSHA standards at issue in *Atlas Roofing* carried no "common law soil," and "[r]ather than reiterate common law terms of art, they instead resembled a detailed building code." *Jarkesy*, 603 U.S. at 137. This analysis, however, does not require a one-to-one analogue between the statutory claim and a common law claim; it only requires that "the statutory claim is in the nature of a common law suit." *Id.* at 2138. Thus, it does not matter that the "the common law in 1791 had nothing to say about due diligence standards for foreign transactions,"[14] Dkt. 12 at 14, any more than that the common in law in 1791 had "nothing to say about" the hedge funds, prime brokerages and investments in life insurance policies that were at issue in *Jarkesy*. It is enough that the BSA and unsafe / unsound practices claims at issue use "common law terms of art," imposing standards of reasonableness and risk, and are in the nature of a common law negligence cause of action.

As for the BSA claim, as CBW's motion explains, Section 5318 incorporates common law standards like reasonableness. *See* 31 U.S.C § 5318(h)(2)(B)(iv)(I)-(II). The relevant regulations also confirm these claims sound in common law. The FDIC alleges that CBW violated 12 C.F.R. § 326.8(b)(1), which requires FDIC-supervised institutions to develop and provide for the continued administration of a written program ***reasonably designed*** to assure and monitor

---

[14] The FDIC's focus on foreign transactions is confusing. Neither the BSA nor the Notice of Charges is limited to foreign transactions.

compliance with recordkeeping and reporting requirements in the BSA. These are common law standards historically applied to banks' oversight obligations. *Cf. Cunningham v. Merchants' Nat. Bank of Manchester, N.H.*, 4 F.2d 25, 29 (1st Cir. 1925) (banks should "use reasonable care in seeing that their depositors are not committing a fraud upon the public"). This is not a "building code"; rather, it is a common law system developed through enforcement actions and supervisory activity, meant to clarify the standards of care to which banks will be held accountable.

As to the unsafe and unsound practices claims, even the FDIC's own handbook explains that its allegations sound in negligence: "Generally, an unsafe or unsound practice encompasses any action, or lack of action, by an institution or an IAP which is contrary to ***generally accepted standards of prudent operation***, the possible consequences of which, if continued, would result in ***abnormal risk*** of loss or damage to an institution, its shareholders, or the Deposit Insurance Fund." FDIC RMS Handbook at 15.1-4 (emphasis added).[15] Again, this belies the FDIC's claim that its claims are merely about "reporting and internal control requirements," as opposed to standards of reasonableness that sound in tort. The FDIC's claims carry common law soil and are in the nature of common law, even if formally based on relatively new legislative enactments.[16]

---

[15] Available at https://www.fdic.gov/resources/supervision-and-examinations/examination-policies-manual/section15-1.pdf.

[16] As noted in CBW's motion, *Atlas Roofing* is of dubious precedential value post-*Jarkesy* and certainly cannot be read expansively to bless taking statutory provisions implementing common law standards of care into the realm of public rights. *Jarkesy* explained that the OSHA provisions in *Atlas Roofing* involved the angles at which ground trenches should be dug, like a detailed building code. Further, the OHSA provisions cited by the FDIC, Dkt. 12 at 15 & n.7, were not addressed in *Atlas Roofing* or *Jarkesy*, but they do not aid the FDIC in any event. They simply state that an employer shall keep a workplace free of "recognized hazards," and that the Secretary—not the regulated party—may make reasonable exemptions from the statutory provisions. 29 U.S.C. §§ 654(a)(1), 655. *Compare, e.g.*, 29 C.F.R. § 1926.350(a) ("(1) Valve protection caps shall be in place and secured. (2) When cylinders are hoisted, they shall be secured on a cradle, slingboard, or pallet. They shall not be hoisted or transported by means of magnets or choker slings. (3) Cylinders shall be moved by tilting and rolling them on their bottom edges. They shall not be intentionally dropped, struck, or permitted to strike each other violently. . . .").

The FDIC has not carried its burden of showing the claims against CBW satisfy the public rights exception. Moreover, even if the public rights exception arguably applies here, *Jarkesy* instructs that an Article III forum still must be provided, 603 U.S. at 132, and the Court cannot accept the FDIC's invitation to expand the public rights exception beyond its recognized, very limited, bounds. CBW has demonstrated a likelihood of success on its Seventh Amendment Claim.

### c. CBW has shown a likelihood of irreparable harm.

CBW has also shown a likelihood of irreparable harm on its Seventh Amendment claim. As CBW set forth, it will suffer multiple forms of irreparable harm including deprivation of its Seventh Amendment right to have a jury as a factfinder; being subjected to an unconstitutional administrative proceeding; and economic and reputational harms. *See* Dkt. 2 at 10-12. The FDIC's protestations that these harms will not befall CBW are unavailing.

The FDIC is wrong to assert that *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020), and *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 764 (10th Cir. 2024) *cert. denied* (No. 24-156), mean there is no "here and now" injury. Although CBW's claim has a structural constitutional component—the type of claim at issue in *Leachco* and *Aposhian*—it is not a pure separation of powers claim. Rather, CBW's claim is also based on individual constitutional rights that satisfy the "here and now" requirement. The FDIC entirely fails to address this distinction.

Instead, the FDIC claims that an adequate post-hearing remedy obviates the harm warranting an injunction. Dkt. 12 at 17-18. This is incorrect. A do-over for an unconstitutional adjudication is no adequate remedy. *See Ward v. Village of Monroeville*, 409 U.S. 57, 61-62 (1972) (cited in CBW's motion and ignored by the FDIC). Instead, there is a long history of preemptive judicial review of Seventh Amendment disputes before the right has been lost. Indeed, courts even have a "responsibility . . . to grant mandamus" relief when necessary to protect a litigant's jury-

trial right in an interlocutory posture. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472 (1962). A basic prerequisite for mandamus is a lack of "other adequate means to attain the [desired] relief." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380 (2004) (citation omitted). If mandamus relief must issue to safeguard Seventh Amendment jury rights in advance of final judgment in normal civil litigation, it is clear that CBW's harm here cannot wait until final agency action for review.[17]

The FDIC is also wrong that post-adjudication review is necessarily available. As noted, if CBW wins in the agency proceedings, it will have suffered a constitutional violation from being subject to an unconstitutional factfinder but will be unable to obtain federal court review to remedy the violation. *See* 12 U.S.C. § 1818(h). Moreover, in the event of an adverse outcome for CBW, a stay of the FDIC's order is not guaranteed while CBW seeks review. *See* 12 C.F.R. § 308.41. The FDIC may therefore be able to impose the CMP, which will cause irreparable financial and reputational harm, before CBW can obtain the relief to which it is entitled—an adjudication compliant with the Seventh Amendment. Thus, despite the FDIC's protestations, *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792 (10th Cir. 2019), and *Elrod v. Burns*, 427 U.S. 347 (1976), apply because absent review now, review will come too late, if at all.

Moreover, the FDIC entirely ignores the last category of economic and reputational harms identified by CBW. The FDIC does not attempt to argue that *Cochran v. SEC*, 20 F.4th 194, 209 (5th Cir. 2021) (en banc), was incorrect about the harm of costs incurred from an unconstitutional proceeding. This makes clear that, unlike in *Leachco*, CBW has traditional harms it will suffer absent an injunction in addition to the harms from undergoing an unconstitutional proceeding.

---

[17] The FDIC's reliance on *Winn v. Cook*, 945 F.3d 1253 (10th Cir. 2019), is misplaced. The Tenth Circuit's concern was federal encroachment on state criminal proceedings when it stated the possibility that later a federal court might need to order a jury trial was not sufficient to justify intervention in the state proceedings. *Id.* at 1263-64. That was an entirely different scenario from here, where there are no federalism concerns at issue that animate *Younger* abstention.

Thus, CBW has sufficiently shown irreparable harm unless this Court intervenes.

### d.  The remaining factors favor a preliminary injunction.

The FDIC ignores the cases that hold that there is no harm to the government from stopping unlawful agency action and that preventing violations of a party's constitutional rights is always in the public interest.  Instead, the FDIC argues that it should be allowed to enforce banking laws. Dkt. 12 at 19-20.  But whatever the FDIC's interest in enforcement of the banking laws, it is not allowed to violate the constitution to do so.  Moreover, the FDIC here is solely seeking CMPs based on alleged practices CBW long ago abandoned and not any injunctive relief related to alleged ongoing practices.  Therefore, CBW has shown an entitlement to a preliminary injunction.

### III.    CBW has sufficiently pleaded its Article II ALJ removal protection claim.

The FDIC also moves to dismiss CBW's ALJ removal protection claim.  Under Supreme Court precedent, CBW has adequately pleaded a claim for relief on the claim.

Article II requires that the President "have sufficient control over the performance of [such ALJs'] functions, and, by implication, . . . be able to choose who holds the positions." *Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022).  This constitutionally required degree of control is lacking when the ALJs are insulated by "[t]wo layers of for-cause protection." *Id.*; *see Free Enter. Fund v. PCAOB*, 561 U.S. 477, 492-508 (2010).  OFIA ALJs are Officers of the United States over whom the President needs to exercise control because, among other things, they preside over adversarial hearings, receive testimony, shape the administrative record, and prepare proposed findings and opinions.  12 C.F.R. § 308.5; *see Lucia v. SEC*, 138 S. Ct. 2044, 2053 55 (2018).  "These activities, even though they take a 'judicial' form, are still exercises of 'the "executive Power," for which the President is ultimately responsible.'" *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (cleaned up).  The FDIC may attempt to remove its ALJs "only for good cause established and determined

18

by the Merit Systems Protection Board[.]" 5 U.S.C. § 7521(a). In turn, by statute, MSPB Members are removable only for inefficiency, neglect of duty, or malfeasance. *Id.* § 1202(d). Certain appointed members of the FDIC and all members of the FRB and NCUA also enjoy for-cause removal protection. *See* 12 U.S.C. § 1812(c)(1); *id.* § 242 (FRB); *id.* § 1752a(c) (NCUA). The FDIC, FRB, and NCUA, as well as the OCC, must all agree to refer an ALJ to the MSPB.

The statute's provision of at least two layers of removal protection prevents that exercise of presidential control and thus violates Article II of the Constitution. *See Free Enter. Fund*, 561 U.S. at 492-508. This injury exists even if a President does not actively desire to remove a particular ALJ, given the potential for removal influences how rational ALJs carry out their duties. After all, Congress sought to make OFIA ALJs politically independent for a reason: it wanted to insulate them from political pressures. *See, e.g.*, *Lucia*, 585 U.S. at 260 (Breyer, J., concurring in the judgment in part and dissenting in part). A showing of particularized cause and effect is not necessary to declare that such insulation from Presidential oversight is unconstitutional.[18]

CBW therefore has sufficiently pleaded a claim that OFIA ALJ removal protections are unconstitutional. CBW acknowledges, however, that there is a circuit split, and while the Tenth Circuit has not addressed OFIA ALJs, it has indicated as to a different agency's ALJs that it is not inclined to find that ALJs exercise sufficient executive power for removal protections to create a constitutional issue. *See Leachco*, 103 F.4th at 764. While CBW believes that the courts holding that double for-cause removal protections for ALJs violate Article II have the analysis correct

---

[18] *Integrity Advance, LLC v. CFPB*'s discussion of the need to allege "compensable harm" under *Collins v. Yellen*, 594 U.S. 220 (2021), was in the context of a post-judgment petition for review where the party sought to unwind agency actions and not to prevent, as in the suit here, undergoing a structurally unconstitutional proceeding in the first place. 48 F.4th 1161, 1170 (10th Cir. 2022).

under Supreme Court caselaw, to the extent this Court believes the Tenth Circuit precedent precludes the claim, CBW fully preserves its argument that the claim is well-pleaded for appeal.

**IV.    FDIC has not shown a bond is warranted here.**

Underscoring the purely punitive nature of its claims, the FDIC argues that if an injunction issues, a bond should be imposed under Rule 65.[19]  It makes a conclusory request that CBW post "substantial" security to pay the costs and damages sustained by the FDIC, should the FDIC be found to have been wrongfully enjoined or restrained.  Dkt. 12 at 20.  "[A] trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction 'if there is an absence of proof showing a likelihood of harm.'"  *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987).  The FDIC has made no attempt to explain, much less prove, it will suffer harm if enjoined, and accordingly no bond is warranted.  *See, e.g.*, *Kansas v. U.S. Dept. of Educ.*, No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024); *McElroy v. Simon Prop. Grp, Inc.*, No. 08–4041–RDR, 2008 WL 4277716 (D. Kan. Sept. 15, 2008).  Courts also routinely waive the bond requirement where, as here, an injunction is sought based on the violation of a constitutional right.  *See, e.g.*, *United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1260 (D. Utah 2017); *Goyette v. City of Minneapolis*, 228 F.R.D. 109, 121 (D. Minn. 2021).

**V.    CONCLUSION**

For these reasons, CBW's motion for a preliminary injunction should be granted, no bond should be required, and the motion to dismiss should be denied.

---

[19] FDIC incorrectly references Federal Rule of Civil Procedure 65(b) instead of Rule 65(c).

Dated: January 15, 2025   Respectfully submitted,

**BERKOWITZ OLIVER LLP**

*/s/ Anthony J. Durone*
Anthony J. Durone (KS Bar # 17492)
Carson M. Hinderks (KS Bar # 25079)
2600 Grand Boulevard, Suite 1200
Kansas City, MO  64108
Telephone:  (816) 561-7007
Fax:  (816) 561-1888
adurone@berkowitzoliver.com
chinderks@berkowitzoliver.com

**MORGAN LEWIS & BOCKIUS LLP**

Allen H. Denson (*pro hac vice*)
D.C. Bar No.: 999210
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004-2541
allen.denson@morganlewis.com
Tel: (202) 739-3000 / Fax: (202) 739-3001

Daniel B. Tehrani (*pro hac vice*)
N.Y. Bar No.: 4422945
101 Park Ave
New York, NY 10178-0060
daniel.tehrani@morganlewis.com
Tel: (212) 309-6150 / Fax: (212) 309-6001

Catherine L. Eschbach (*pro hac vice*)
TX Bar No.: 24097665
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5006
catherine.eschbach@morganlewis.com
Tel: (713) 890-5719 / Fax: (713) 890-5001

*Attorneys for CBW Bank*

## CERTIFICATE OF SERVICE

I certify that on January 15, 2025, I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Anthony J. Durone
*Attorney for CBW Bank*