# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CBW BANK,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, *et al.*,<br><br>Defendants. | Case No.: 24-cv-2535-DDC-BCS |

## FEDERAL DEPOSIT INSURANCE CORPORATION'S
## REPLY IN SUPPORT OF ITS MOTION TO DISMISS

FEDERAL DEPOSIT INSURANCE CORPORATION
Andrew Dober
Senior Counsel

Erik Bond
Counsel
Dominique Park
Senior Attorney
3501 Fairfax Drive
Arlington, VA 22226-3500
Tel.: (703) 562-6461
Fax: (703) 562-2477
Email: erbond@fdic.gov
Email: dompark@fdic.gov

DATED: January 31, 2025

## TABLE OF CONTENTS

**ARGUMENT** ................................................................................................................................. 1

**I.   THIS COURT LACKS SUBJECT MATTER JURISDICTION** ..................................... 1

    A.   Section 1818(i)'s Explicit Bar Applies to Constitutional Claims. ............................ 1

    B.   The Plain Text of Section 1818(i)(1) Forecloses CBW's Arguments. ..................... 3

**II.  CBW'S SEVENTH AMENDMENT CLAIM HAS NO MERIT.** ...................................... 6

    C.   The FDIC's Enforcement Proceeding Implicates Sovereign Prerogatives. ............. 6

    D.   The Bank Secrecy Act Is Not Rooted in the Common Law. .................................. 12

**III. CBW'S ALJ REMOVABILITY CHALLENGE HAS NO MERIT.** .............................. 15

**CONCLUSION** ........................................................................................................................... 15

The FDIC's motion to dismiss should be granted. CBW Bank ("CBW") and various banking groups ("Amici") ask this Court to disregard 12 U.S.C. § 1818's express jurisdictional bar, but the Supreme Court has described that statute as "plain" and "preclusive" and as providing "clear and convincing evidence that Congress intended to deny the District Court jurisdiction to review and enjoin . . . ongoing administrative proceedings," *Board of Governors v. MCorp Fin. Inc.*, 502 U.S. 32, 38, 44 (1991). CBW cites no persuasive support for a contrary reading. CBW's and Amici's Seventh Amendment arguments likewise have no merit, as administrative proceedings to enforce banking laws generally and the Bank Secrecy Act (BSA) specifically fall within the "public rights" exception upheld in *SEC v. Jarkesy*, 603 U.S. 109 (2024). Dismissal of this case is warranted.

## ARGUMENT

### I.  THIS COURT LACKS SUBJECT MATTER JURISDICTION.

#### A.  Section 1818(i)'s Explicit Bar Applies to Constitutional Claims.

There is a glaring jurisdictional defect in this case. The FDIC cited numerous cases in its opening brief that treat § 1818(i)(1) as an explicit bar to jurisdiction. ECF 12 at 6-11. CBW casts no meaningful doubt on the correctness of those authorities.[1]

That CBW raises constitutional claims, "structural" or otherwise, ECF 17 at 3, does not render § 1818(i)(1) inapplicable. CBW largely ignores the many cases upholding similar withdrawals of jurisdiction over structural constitutional claims, *see* ECF 12 at 9-10 & nn.3-4,[2]

---

[1] The FDIC also cited Justice Gorsuch's concurrence in *Axon Enterprises v. FTC*, 598 U.S. 175 (2023), ECF 12 at 9, and CBW takes issue with that citation, claiming that Justice Gorsuch had no views on the meaning of § 1818(i)(1). ECF 17 at 7. As Justice Gorsuch cited that provision as an example of an explicit withdrawal of jurisdiction, his meaning is clear, and CBW does not dispute that such explicit bars are not subject to the *Thunder Basin* analysis.

[2] CBW acknowledges *Bank of Louisiana v. FDIC*, 919 F.3d 916 (5th Cir. 2019), incorrectly claiming that it was an implicit-bar case; in fact, the court there said that the FDIC "correctly argues" that § 1818(i)(1) was an "explicit jurisdictional bar," and undertook the *Thunder Basin*

and its attempt to distinguish *MCorp*, ECF 17 at 5-6, misses the mark: Section 1818(i)'s language is not any less "plain and preclusive" as to constitutional claims than as to statutory claims, and the Court said that post-hearing review was a "meaningful and adequate opportunity for judicial review" of the validity of the regulation at issue. ECF 17 at 5-6; *MCorp*, 502 U.S. at 44. The same is true here. There is no reason why being subjected to an administrative proceeding with no jury present is less remediable than undergoing the same proceeding based on an invalid regulation. *See Ponte v. FDIC*, 24-cv-2379 (APM), 2024 WL 4730602, *8 (D.D.C. Oct. 11, 2024) (§ 1818(i)'s jurisdictional bar applies to Seventh Amendment challenges). Amici rely on *Collins v. Department of the Treasury*, 83 F.4th 970, 980 (5th Cir. 2023), ECF 23 at 4, but that case did not involve an enforcement proceeding, and no alternative review channel to hear the plaintiffs' claims was available, as 12 U.S.C. § 1818(h) affords here.³

CBW cites *Burgess v. FDIC*, 639 F. Supp. 3d 732 (N.D. Tex. 2022), *appeal pending*, No. 22-11172 (5th Cir.), for the proposition that an explicit bar cannot be found unless the statutory bar expressly references jurisdictional statutes like 28 U.S.C. § 1331. ECF 17 at 3. The Supreme Court, of course, has found an express bar without such language, in *MCorp* and in other cases. *See, e.g.*, *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 512 (1981) (applying Tax Injunction Act's jurisdictional bar: "The district courts shall not enjoin, suspend or restrain" state tax assessments); *Milk Wagon Drivers' Union v. Lake Valley Farm Prod.*, 311 U.S. 91, 101 (1940) (applying Norris-LaGuardia Act's jurisdictional bar: "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute . . . ."). CBW's reliance on *Shalala v. Illinois*

---

review simply because it was "prudent" and in order to "reinforce its [already-reached] conclusion." 919 F.3d at 924-25; *see also Cochran v. SEC*, 20 F.4th 194, 204 (5th Cir. 2021) (*en banc*) (*Bank of Louisiana* court found that "jurisdiction was *explicitly* divested" by § 1818(i)(1)).
³ *FDIC v. Bank of Coushatta*, 930 F.2d 1122 (5th Cir. 1991), cited in *Collins*, was similar.

2

*Council*, 529 U.S. 1 (2000), ECF 17 at 3, is unavailing: the review channel provided there was in district court, and it was necessary to clarify that *other* types of district court jurisdiction (under general federal question, the Little Tucker Act, and the Federal Tort Claims Act) were precluded. Here, however, Congress channeled review to the courts of appeals exclusively, and it was not necessary to name other types of jurisdiction that were displaced.[4] Congress's choice to postpone that process is not a complete denial of review under *Webster v. Doe*, 486 U.S. 592 (1988).

Amici's contention, ECF 23 at 3, that Congress must specifically mention constitutional claims in its jurisdictional bar is equally incorrect. The Supreme Court has often found such a withdrawal in statutes that do not mention constitutional claims. *See* ECF 12 at 10 n.3. Amici simply ignore the cases cited by the FDIC. Congress can and does use sweeping preclusive language in limiting the jurisdiction of the courts, and courts must abide by those preclusions.

### B. The Plain Text of Section 1818(i)(1) Forecloses CBW's Arguments.

CBW argues that *Henry v. OTS*, 43 F.3d 507, 512-13 (10th Cir. 1994) does not control because here the Bank is seeking to stop the agency's administrative "adjudication itself," instead of challenging the validity of a consent order. ECF 17 at 6. But § 1818(i)(1) applies equally to "any notice or order," and flatly prohibits issuing any relief affecting the "enforcement of any such notice" including "review[ing]" or "suspend[ing]" the notice. This Court lacks jurisdiction to hear this case because enjoining prosecution of the notice of charges (or declaring the proceeding unconstitutional) would involve review and suspension of the notice. The *Henry*

---

[4] The Court has since clarified this issue, explaining that broad language in a jurisdictional bar obviates explicit references to other jurisdictional statutes. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 468-69 (2007) (rejecting district court's view that "[t]o eliminate jurisdiction . . . those jurisdiction-conferring sections would have to be referenced," and holding that it is unnecessary and not "natural" to "list[] all the conceivable provisions of the United States Code whose conferral of jurisdiction is being eliminated").

plaintiff's challenge to the validity of a consent order "affect[s]" the FDIC's proceeding no more than—and indeed, much less than—CBW's request to declare the entire proceeding invalid.

Equally unpersuasive is CBW's argument that § 1818(i) does not mention "proceeding," so therefore the Court is free to enjoin the enforcement case. ECF 17 at 3. CBW cites no examples of Congress inserting the term "proceeding" when it intends to broaden a statute's reach. Stripping a court of jurisdiction to "affect by injunction or otherwise the issuance . . . of any notice or order under" § 1818 is more than broad enough to bar the injunction CBW seeks.

CBW's argument that the canon of constitutional avoidance requires a very narrow reading of § 1818(i) also falls short. First, § 1818(i) as applied here is constitutional; there is no need to resort to CBW's unnatural, "saving" interpretation. *Ponte v. FDIC*, 24-cv-2379 (APM), 2024 WL 4730602, *8 (D.D.C. Oct. 11, 2024). Second, the prospect that CBW might prevail at the administrative level and have no grounds for appeal is entirely consistent with ordinary judicial review, and it is certainly not grounds for overriding the clearly expressed will of Congress. Contrary to CBW's assertions, constitutional avoidance favors resolving matters on the merits in precisely this way. *United States v. Cusumano*, 83 F.3d 1247, 1250 (10th Cir. 1996) (noting "federal courts should address constitutional questions only when necessary to a resolution of the case or controversy before [them]"); *see also Blitz v. Donovan*, 740 F.2d 1241, 1248-49 (D.C. Cir. 1984) ("[C]onstitutional challenges do not exempt a litigant from exhausting available administrative remedies when pursuit of those remedies may avert the need for constitutional adjudication. . . . [T]he possibility that administrative relief could have made constitutional adjudication unnecessary" supported the view that exhaustion was necessary). At any rate, the role of the jury as "factfinder" does not make Seventh Amendment claims uniquely pressing, as CBW claims; courts of appeals can set aside ALJ findings of fact on Seventh

4

Amendment grounds, as the Fifth Circuit did (and the Supreme Court affirmed) in *Jarkesy* when they heard the appeal at the conclusion of the proceedings. There was no suggestion in *Jarkesy* that any Seventh Amendment violation had become "unremediable," as CBW claims, ECF 17 at 4. Neither would CBW's Seventh Amendment claim if raised on appeal.

Finally, contrary to CBW's position, ECF 17 at 8 n.9, § 1818(i)'s prohibition applies both to the injunction request *and* the claims for declaratory judgment. 12 U.S.C. § 1818(i) ("no court shall have jurisdiction to affect by injunction or otherwise. . . ."). Each of these claims is directed towards stopping the administrative proceeding, either through outright injunction or through review of the notice and a declaration that the proceeding is unconstitutional. CBW's requested declaratory relief falls squarely within § 1818(i)'s "injunction or otherwise" language; courts have often characterized declaratory relief as equitable. In *Manning v. United States*, 146 F.3d 808 (10th Cir. 1998), for example, the Tenth Circuit found that an action for a declaration of rights with no monetary relief was equitable rather than legal and thus did not trigger the Seventh Amendment. *Id.* at 812; *see also Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943) (declaratory judgment suit is "essentially an equitable cause of action"); *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 400 F. Supp. 2d 1273, 1275 (D. Kan. 2005) ("[T]he right to a jury trial is not triggered [when] the plaintiff seeks only equitable relief such as an injunction and/or a declaratory judgment."). Here, likewise, CBW seeks equitable relief: it seeks to invalidate the FDIC's proceeding, not obtain monetary relief. *See Moats v. NCUA*, 2024 WL 1724271, *3 (S.D. Tex. Apr. 9, 2024) (dismissing both declaratory and injunctive claims under statute paralleling § 1818(i)(1)); *Ponte v. FDIC*, 673 F. Supp. 3d 145 (D.R.I. 2023) (same).[5]

---

[5] Amici's litany of complaints about the FDIC's enforcement proceedings, ECF 23 at 4-8, also does not establish that review of those proceedings is unavailable.

5

## II.  CBW'S SEVENTH AMENDMENT CLAIM HAS NO MERIT.

None of CBW's arguments meaningfully undermines the FDIC's showing that the public rights exception permits the adjudication of CBW's Bank Secrecy Act (BSA) violations before an Administrative Law Judge. Because the FDIC's action is quintessentially the function of a sovereign rather than a private litigant, and because the common law in 1791 contemplated nothing analogous to an action to enforce the BSA, the public rights exception applies.

### C.  The FDIC's Enforcement Proceeding Implicates Sovereign Prerogatives.

The *Jarkesy* Court preserved the public rights exception for "distinctive areas involving governmental prerogatives," and the FDIC's roles as deposit insurer, banking regulator, and protector of public funds all qualify. CBW's attempts to show otherwise miss the mark.

*Deposit insurer*. In 1933, in response to the collapse of the U.S. banking industry, Congress created a unique *statutory* bank deposit insurance system and established the FDIC to administer it. That Congress did not create the concept of insurance in 1933, as CBW argues, ECF 17 at 11, is irrelevant, as the FDIC does not enforce its scheme via actions that resemble traditional common-law insurance actions.[6] The creation *ex nihilo* of deposit insurance implicates distinct "governmental prerogatives," and as the FDIC has shown, ECF 12 at 13, enforcement proceedings to maintain the safe condition of insured institutions are part and parcel of the deposit insurance system. CBW ignores the FDIC's showing that, under *Jarkesy* and *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), the FDIC's enforcement proceedings are "closely intertwined" with a regulatory scheme and thus fall within the public rights exception.

---

[6] This case illustrates as much. CBW contends that "[d]isputes between insurers and insureds about policy terms or the reasonableness of a party's conduct are classic common law claims," ECF 17 at 11, but the FDIC's enforcement action is not about "policy terms" or "the reasonableness of [CBW's] conduct," it is about whether CBW violated the BSA. Adjudicating that will implicate the common law in no way, shape, or form.

6

Instead, CBW asserts that deposit insurance is different from immigration, tariffs, and customs duties, because the latter involve "inherent power[s]." ECF 17 at 10. But the "governmental prerogatives" that the *Jarkesy* Court cited are not limited to "inherent powers," as they extend to the "granting of public benefits" like "payments to veterans" and "pensions"—i.e., obligations that the federal government has *assumed*, not those conferred by the constitutional text. That is why the *Jarkesy* Court, in relying on the *Granfinanciera* formulation, expressly preserved the exception as to statutory actions that are "closely intertwined" with a federal regulatory program Congress "has power to enact," not Congress's "inherent powers." Congress has the leeway to enact all sorts of laws that address matters other than "inherent powers."

CBW also draws the wrong comparison in asserting that "[t]he BSA . . . regulates financial markets and banking practices that pre-date its enactment in 1970." ECF 17 at 10. The FDIC brought its enforcement action under the Federal Deposit Insurance Act, not the BSA. The focus of the sovereign-prerogative public rights analysis is whether the enforcement scheme is so "closely intertwined with" a valid regulatory framework that it cannot be removed from that framework, and hence it is in § 1818 that the Court must find a "pre-existing market"—which, of course, did not exist, as there was no such thing as deposit insurance until Congress created it. At any rate, even if CBW were correct, it would not matter: the BSA does not "regulate transactions between private individuals interacting in a pre-existing market" either. It establishes standards of conduct for regulated institutions, just as OSHA established workplace safety standards and *Atlas Roofing Co. v. OSHA*, 430 U.S. 442 (1977), applied the exception to actions enforcing those standards. That there were financial institutions before the BSA was enacted is not relevant; there were workplaces before OSHA was enacted.[7]

---

[7] It is pertinent as well that, historically, state-chartered financial institutions have been viewed as "quasi-public instruments." *Hopkins Fed. Sav. & Loan Ass'n v. Cleary*, 296 U.S. 315, 336

*Banking regulator*. The protection of the banking industry likewise corresponds to uniquely governmental prerogatives. *See Spawn v. Western Bank*, 989 F.2d 830, 837 (5th Cir. 1993) ("[T]he FDIC is an instrumentality created by the government for the public welfare . . . to provide for the sound, effective, and uninterrupted operation of the banking system."); *see also FHFA v. JPMorgan Chase & Co.*, 978 F. Supp. 2d 267, 273 (S.D.N.Y. 2013) ("regulation of the banking sector" needed to "maintain public confidence in the financial system").

Furthermore, the historical expectation of comprehensive banking regulation, and of administrative tribunals as part of that regulation, is well established. *See Jarkesy*, 603 U.S. at 128-29 (public rights exception applicable where there is an "unbroken tradition" of certain types of proceedings). The FDIC is more than 90 years old, the Federal Reserve Board of Governors and the Office of the Comptroller of the Currency are more than 100 years old, and the expectation of close regulatory scrutiny has long been accepted as the price of entering into the banking industry. *Fahey v. Mallonee*, 332 U.S. 245, 250 (1947). Administrative hearings to enforce banking regulations constitute an "unbroken tradition" going back decades. *See* Pub. L. 81-797, § 8 (Sept. 21, 1950) (providing for termination of deposit insurance after hearing); S. Rep. 89-1482, at 6 (1966 Senate Report describing Federal Home Loan Bank Board's administrative remedies under, *inter alia*, Home Owners' Loan Act of 1933). SEC administrative tribunals, by contrast, date back only to 2010. *Jarkesy*, 603 U.S. at 109.

As the FDIC has shown, moreover, this scheme gives rise to "matters [that] historically could have been determined *exclusively* by the executive and legislative branches," unlike the

---

(1935); *see also Farmers' & Mechs.' Nat'l Bank v. Dearing*, 91 U.S. 29, 33 (1875) (banks are "instruments designed to be used to aid the government in the administration of an important branch of the public service"); *Atherton v. Anderson,* 99 F.2d 883, 888 (6th Cir. 1938) ("A national bank is not a private corporation in which stockholders alone are interested. It is a quasi governmental agency, and one of its principal purposes among others is to hold and safekeep the money of its depositors."). To view banks as purely private entities is ahistorical.

8

SEC's. *Jarkesy*, 603 U.S. at 128; *see* ECF 12 at 13. As Congress did not provide—and has never provided—a district court enforcement regime for banking regulators, denying the exception would "go far to dismantle the statutory scheme." *Granfinanciera*, 492 U.S. at 61 (citations omitted). CBW's only response to this is to argue that equitable remedies are still available, ECF 17 at 13, but an institution that chooses to violate the law is not likely to be significantly deterred by the prospect that, if caught, it might have to stop. That is why Congress created the CMP remedy in the first place, *see* H.R. Rep. 95-1383, at 17 (1978) ("Daily money penalties should serve as deterrents to violations of laws, rules, regulations, and orders of the agencies."). Cutting that remedy out of the statutory scheme would "go far to dismantle" the scheme.

CBW further contends that voluntary participation in a regulatory scheme is irrelevant, ECF 17 at 12, but the Supreme Court has held that "Congress has the power . . . to authorize an agency administering a complex regulatory scheme to allocate costs and benefits among voluntary participants in the program without providing an Article III adjudication." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 589 (1985). That is consistent with *Jarkesy*'s holding that the exception applies to industries so pervasively regulated that "no party had a 'vested right' to act in that area without Congress's approval," as contrasted with the "private individuals interacting in a pre-existing market" at issue when the SEC brings an action. 603 U.S. at 129, 135.[8] CBW voluntarily accepted deposit insurance and has no vested right here.

*Protector of public funds*. CBW does not dispute that the FDIC is responsible for the

---

[8] It is notable as well that the Supreme Court has applied the exception to matters "in which resolution of the claim by an *expert* Government agency is deemed essential to a limited regulatory objective within the agency's authority. . ." *Stern v. Marshall*, 564 U.S. 462, 490-91 (2011) (emphasis added). Congress did in fact deem that essential when it created the FDIC's enforcement scheme and provided for adjudication by "specialized agencies which over the years have constantly dealt with the sensitive supervisory problems peculiar to our financial institutions and which have the necessary expertise that courts of law do not." S. Rep. 89-1482, at 6 (1966). For this reason, as well, it is appropriate to apply the public rights exception.

9

Deposit Insurance Fund (DIF) or that the FDIC's enforcement proceedings, by preventing the failure of insured institutions, forestall drawdowns on the DIF. It simply claims that, because the BSA is also enforced against nonbanks, it does not implicate public funds. ECF 17 at 11. But the FDIC does not argue that BSA violations inherently endanger the public fisc, it argues that CBW's violations do so because CBW is an insured institution.[9]

For this reason, CBW's attempt to distinguish prior decisions applying the exception to proceedings under § 1818, ECF 17 at 11-12, has no merit. CBW claims that the court in *Simpson v. OTS*, 29 F.3d 1418 (9th Cir. 1994), relied on an outdated analysis, but the court there cited the "purpose of enforcement [actions] to safeguard the thrift industry, the depositors and the federal insurance fund," and thus Congress's intent to "effectuate and protect the public interest" (along with the provision of "adequate and meaningful judicial review"). 29 F.3d at 1423. That corresponds with the *Jarkesy* Court's invocation of "distinctive areas involving governmental prerogatives" as triggering the exception. *See also Cavallari v. OCC*, 57 F.3d 137, 145 (2d Cir. 1995) (applying exception and noting that Congress created the enforcement scheme "in order to safeguard the thrift industry and the FDIC").

Amici, for their part, offer a series of irrelevant assertions. They claim, without citing examples, that juries heard cases "involving bank-related misconduct" prior to the founding,

---

[9] CBW also claims that the DIF is a "private fund" because its sources are "assessments . . . on FDIC-insured institutions and interest earned on funds invested" in Treasury bonds. ECF 17 at 11 n.10. The same logic would hold that the U.S. Treasury is a "private fund" because its sources include tax assessments on private citizens. Congress created the DIF to support a public program, namely federal deposit insurance: the Fund backstops insured institutions by guaranteeing depositors access to their funds when an institution fails. *See* 12 U.S.C. § 1821(c)(4)(A) ("There is established the Deposit Insurance Fund, which the Corporation shall . . . use to carry out its insurance purposes . . . ."); *id.* § 1821(c)(4)(B) ("The Deposit Insurance Fund shall be available to the Corporation for use with respect to insured depository institutions the deposits of which are insured by the Deposit Insurance Fund."). It is a public fund. *See Zucker v. Rodriguez*, 919 F.3d 649, 655 (1st Cir. 2019) (DIF guaranteed by full faith and credit of the United States).

ECF 23 at 9, but the public rights doctrine is more specific than that: it looks to the "substance of the suit," not whether juries hear matters involving the same industry. *Jarkesy*, 603 U.S. at 133. They cite enforcement matters involving theories and claims not presented here, ECF 23 at 10-11, and claim that BSA enforcement must be tried before a jury because it is not "uniquely" tailored to agency adjudication, *id.* at 13, 14, a standard that appears nowhere in *Jarkesy* or the Supreme Court's prior public rights decisions (and that is plainly inconsistent with the application of the public rights doctrine in areas like patent law, *see Jarkesy*, 603 U.S. at 130, where juries routinely hear disputes and have always done so, *see, e.g.*, *Whittemore v. Cutter*, 29 F. Cas. 1120 (C.C.D. Mass. 1813) (Story, J.)). The supposed possibility of "rout[ing] criminal prosecutions through executive agencies," ECF 23 at 13 (citations omitted), has no application to the FDIC, an independent agency. That the FDIC considers matters other than the impact on the DIF when weighing an enforcement action, *id.* at 15, does not make the DIF irrelevant, it means that the FDIC also considers how egregious the conduct is. Presumably, Amici are not urging CMP actions for minor or inadvertent errors. Amici argue that "[t]he FDIC is not acting to protect its insurance fund," *id.* at 14, but enforcing the prohibition on unsafe and unsound banking practices does that by definition.[10] And any "analog[y] to a private insurer," ECF 23 at 14, merely underscores the salient difference: private insurers lack the right to enforce insured entities' compliance with applicable laws, as the FDIC is doing here.

  Finally, CBW claims that the FDIC's argument would apply the public rights exception to every statutory scheme, ECF 17 at 13, but that is not the case. The FDIC has enumerated the special circumstances and considerations surrounding banking enforcement actions that

---

[10] *See, e.g.*, *In re Seidman*, 37 F.3d 911, 926 (3d Cir. 1994) (unsafe or unsound practice "embraces any action . . . [threatening] abnormal risk of loss or damage to [*inter alia*] the agencies administering the insurance funds") (citations omitted); S. Rep. 89-1482, at 1 (referencing "unsafe and unsound practices" that threaten "the Nation's financial institutions").

11

implicate public rights, ECF 12 at 11, few of which are found elsewhere. CBW's *ipse dixit* assertion that those circumstances are "not enough," ECF 12 at 13, identifies no meaningful distinction or standard grounded in the Supreme Court's public rights decisions. The FDIC has done so, and it is appropriate to apply the exception here.

        **D.**        **The Bank Secrecy Act Is Not Rooted in the Common Law.**

As for CBW's contention that the BSA is rooted in the common law because it mentions "reasonabl[eness]," ECF 17 at 14, this comparison to the securities fraud action in *Jarkesy* fails. Even assuming that "reasonableness" specifically references a common-law idea (rather than a concept as old as human thought), the Court in *Jarkesy* explained that "the Seventh Amendment does apply to novel statutory regimes, so long as the claims are akin to common law *claims*." 603 U.S. at 139 (emphasis added). "Reasonableness" was not a common law claim. There were no "common law claims" for a bank's failure to create a compliance system adequate to monitor high-risk customers and police transactions with countries where international money laundering is common. There were no "common law claims" for failures to report questionable transactions to FinCEN. There were no "common law claims" for failure to screen customers at the time of onboarding. The existence of wrongful death suits did not make the OSHA workplace standards at issue in *Atlas Roofing* "common-law claims," and *a fortiori* the bare concept of reasonableness is not nearly enough to tie the BSA to the common law as it existed in 1791.[11] There is hardly a regulatory scheme in the U.S. Code that lacks a notion of "reasonableness."

Amici's attempts to link the BSA to the common law are no better founded. Amici cite the possibility of civil penalties for negligent BSA violations, ECF 23 at 13, overlooking that

---

[11] CBW's repeated suggestion, ECF 17 at 13, 15 n.16, that *Atlas Roofing* should be regarded as overruled runs afoul of *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (lower courts must "leav[e] to this Court the prerogative of overruling its own decisions"), and contradicts the *Jarkesy* Court's express statement that it was not overruling *Atlas Roofing*.

negligence refers both to a mental state and to a common-law cause of action. That the BSA incorporates criminal penalties and juries may therefore sometimes apply it, *id.*, does not make it rooted in the common law, and the fact that "some conduct that violates the BSA . . . has been found to state common-law claims," *id.*, makes no difference, as the OSH Act plainly encompasses conduct that can also give rise to wrongful death and other common-law actions.

At bottom, the Supreme Court in *Jarkesy* concluded that Congress had adapted common-law fraud actions when it authorized the SEC to prosecute securities fraud. 603 U.S. at 140 ("[L]aw courts have dealt with fraud actions since before the founding, and Congress had authorized the SEC to bring such actions in Article III courts and still authorizes the SEC to do so today. . . ."). The BSA is different: at the founding, "law courts" were not "deal[ing] with actions" to require banks to monitor suspicious transactions, and there was no history of court enforcement of such monitoring standards.[12] In *Jarkesy*, "the pertinent [securities fraud] statutory provisions derive[d] from, and [were] interpreted in light of, their common law counterparts," as both "target[ed] the same basic conduct," and courts "often consider[ed] common law fraud principles when interpreting federal securities law." 603 U.S. at 125, 126, 138. None of that is true here: the BSA has no "common law counterpart" that "targeted the same basic conduct," that it "derives from," or that guides its interpretation. CBW and Amici repeatedly claim that the BSA merely codified the common law, ECF 17 at 10, 14, ECF 23 at 12-13, but decisions construing the BSA are notably devoid of references to this entirely fictional

---

[12] Indeed, the BSA was enacted because maintaining bank transaction records was then, to a great extent, purely voluntary (Treasury regulations had previously required much less extensive reporting), and many banks had mostly discontinued records retention. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 27-28 (1974). Mandatory retention and reporting were therefore largely new when the BSA was enacted, and indeed the Supreme Court had to clarify that the BSA's reporting requirements did not violate the Fourth Amendment. *Id.* at 66.

13

underlying common law action to require due diligence in monitoring bank transactions.[13] The "close relationship" between common-law and statutory actions in *Jarkesy*, 603 U.S. at 126, is wholly absent here.[14]

Finally, CBW argues that the FDIC's unsafe and unsound practice claims "sound in negligence." ECF 17 at 15. They do not in any pertinent respect: at the time of the founding, the common law had nothing to say about prudent bank management. As the FDIC has explained, ECF 12 at 15, and CBW ignores, there was no such thing as a negligence or breach of fiduciary duty action at common law against bank managers until the late nineteenth century. *See* Patricia A. McCoy, *A Political Economy of the Business Judgment Rule in Banking: Implications for Corporate Law*, 47 Case W. Res. L. Rev. 1, 24-25, 35-36 (1996). Amici cite various mid-nineteenth-century state statutes, ECF 23 at 11 n.18, but those statutes conferred oversight powers on state banking commissioners, including the power to seek injunctions against banks operated in a hazardous fashion; they did not make bank officers personally liable.[15] As those statutes substantially postdated the founding and had nothing to do with the common law, they

---

[13] *See, e.g.*, *Bittner v. United States*, 598 U.S. 85 (2023); *Shultz*; *United States v. Kaatz*, 705 F.2d 1237 (10th Cir. 1983).

[14] CBW and Amici attempt to link the BSA's monitoring obligations to older case law, ECF 17 at 15, ECF 23 at 12 n.19, but some of those decisions dealt with statutory obligations rather than common-law duties (even assuming that those duties date back to 1791, which CBW and Amici do not attempt to show). *See, e.g.*, *Cunningham v. Merchants' Nat'l Bank*, 4 F.2d 25 (1st Cir. 1925) (applying state bankruptcy law); *Cunningham v. Commissioner*, 144 N.E. 447, 454 (same). Some of them underscore the *absence* of pre-BSA bank obligations, moreover, *see, e.g.*, *Cunningham*, 4 F.2d at 29-30 ("Banks are under no duty at law to warn the investing public as to the financial condition of their depositors"), and all of these cases are distinguishable, as they deal with banks' liabilities once fraud is committed. The BSA, by contrast, creates monitoring obligations that banks must comply with whether or not their customers have already been caught engaging in money laundering or other misconduct. The BSA, in other words, imposes *ex ante* regulatory obligations, while some case law provides for *ex post* monetary liability to private parties; that does not make the BSA grounded in the common law.

[15] *See Why Supervise Banks? The Foundations of the American Monetary Settlement*, 74 Vand. L. Rev. 951, 991-92 (2021).

14

are relevant for present purposes only insofar as they underscore that *any* prudential oversight of banks remained a novel concept as late as the mid-1800s.[16]

Likewise, both CBW and Amici cite the accumulation of generally accepted standards of prudent banking operation, ECF 17 at 15, ECF 23 at 11-12, but overlook that those standards were originally developed with reference to statutes enacted after the founding, not as a matter of common law. *See, e.g.*, David H. Min, *Federalizing Bank Governance*, 51 Loy. U. Chi. L.J. 833, 857-58 (2020); *see also Groos Nat. Bank v. OCC*, 573 F.2d 889, 897 (5th Cir. 1978) ("The phrase 'unsafe or unsound banking practice' is widely used in the regulatory statutes and in case law, and one of the purposes of the banking acts is clearly to commit the progressive definition and eradication of such practices to the expertise of the appropriate regulatory agencies."). The FDIC's unsafe and unsound practice claims rest on the same conduct as its BSA claims. *See* ECF 12-1 ¶ 99. Thus, the origins of the FDIC's action are purely statutory, and the action addresses actions and obligations that 18th-century bankers would not even have recognized.

Here as well, therefore, there is no relevant analogue to support CBW's "rooted in common law soil" argument. The public rights exception applies. Count I should be dismissed.

### III. CBW'S ALJ REMOVABILITY CHALLENGE HAS NO MERIT.

CBW's challenge to the ALJ's removability (Count II) is foreclosed by *Leachco v. CPSC*, 103 F.4th 748 (10th Cir. 2024). CBW identifies no salient differences between the ALJs in that case and this one. ECF 17 at 19. Count II should be dismissed.

### CONCLUSION

For the foregoing reasons, the FDIC respectfully requests that this case be dismissed.

---

[16] *See, e.g.*, *id.* at 988-89 (New York "imposed separation [of money creation from commercial activities] and supervision" of banks for the first time in 1838); *id.* at 992 (New York "introduced the concepts of safety and soundness into law, mimicking similar statutes already enacted in Massachusetts, New Hampshire, and Connecticut").

       Respectfully submitted,

       FEDERAL DEPOSIT INSURANCE CORPORATION
       Andrew Dober
       Senior Counsel

       /s/ Erik Bond
       Erik Bond, N.Y. Bar Reg. 4316030
       District of Kansas Bar No. 79224
       Counsel
       Dominique Park, WSBA Bar No. 38925
       District of Kansas Bar No. 79196
       Senior Attorney
       3501 Fairfax Drive
       Arlington, VA 22226-3500
       Tel.: (703) 562-6461
       Fax: (703) 562-2477
       Email: erbond@fdic.gov

DATED: January 31, 2025